1

2   FILED'08 MAR 25 15:28USDC-ORP

3

4

5

6

7                IN THE UNITED STATES DISTRICT COURT

8                   FOR THE DISTRICT OF OREGON

9

10  DARCIE HANSEN,                    )
                                      )    No.   07-247-HU
11                 Plaintiff,         )
                                      )
12       v.                           )
                                      )    OPINION AND ORDER
13                                    )
    ADVO, INC.,                       )
14                                    )
                   Defendant.         )
15  _____  )

16  Sara L. Allen
    Michael D. Hallas
17  Allen2 Law, LLC
    811 S.W. Naito Parkway, Suite 420
18  Portland, Oregon 97204
          Attorneys for plaintiff
19
    Scott Oborne
20  Mark Crabtree
    Jackson Lewis LLP
21  806 S.W. Broadway, Suite 400
    Portland, Oregon 97205
22        Attorneys for defendant

23

24  HUBEL, Magistrate Judge:

25       Darcie Hansen brings this action against her former employer,

26  Advo, Inc., asserting claims for sex discrimination, sexual

27  harassment, and retaliation in violation of Title VII, 42 U.S.C. §

28  OPINION AND ORDER Page 1

2000e and Or. Rev. Stat. § 659A.030, and a common law claim for intentional infliction of emotional distress. She seeks back pay and front pay; emotional distress damages; punitive damages; and attorney's fees and costs.

### Factual Background

Advo is a direct mail company that employs approximately 3,700 people at about 57 locations. Advo is headquartered in Windsor, Connecticut. Advo hired Hansen on September 7, 2004 to work in its Portland, Oregon sales office; Hansen worked for Advo until the first week of March 2006, a period of about 17 months.

During Hansen's employment, the Portland office was managed by a District Sales Manager, Tim Townsend. The District Sales Manager is responsible for managing the sales officers and directing other office personnel. Townsend was Hansen's supervisor. Human resources (HR) personnel are not present at every Advo facility; during Hansen's employment, the HR professionals assigned to the Portland office worked out of Advo's San Francisco and Los Angeles offices.

From approximately August 2003 to December 2, 2005, the HR professional assigned to the Portland office was Dewayne Quock, who worked in the San Francisco office. After December 2, 2005, Emanuel Maxwell replaced Quock as HR professional for the Portland office. Besides Townsend and Hansen, the only Advo employees in the Portland office during Hansen's employment were Regional Account Executives (RAEs), Kenneth Niebur, Richard Cronkrite and Roger Fune. Another RAE, James Barner, worked for Advo during part of the time Hansen was employed there, but was laid off in May 2005. The

OPINION AND ORDER Page 2

1  RAEs did not supervise Hansen.

2      Hansen asserts that she was told at the time of her job
3  interview with Townsend that her job title was to be "Sales and
4  Marketing Assistant." Hansen Declaration ¶ 1. As evidentiary
5  support for this statement, Hansen attaches business cards made for
6  her by Advo, which give her title as "Marketing and Sales
7  Assistant."

8      Emanuel Maxwell, Advo's HR person for the Portland office,
9  states in an affidavit that Hansen's job title was "Sales
10 Administrative Assistant," Maxwell Declaration, ¶ 7, but the
11 position description attached to Maxwell's affidavit and cited as
12 evidence for that statement merely identifies the job as
13 "Assistant." Maxwell Declaration Exhibit C. The duties described in
14 the position are consistent with those of an administrative or
15 office assistant, including calendar coordination and management
16 for the office manager; organizing and coordinating meetings;
17 directing incoming and outgoing correspondence; composing routine
18 responses to correspondence; taking meeting minutes and notes;
19 researching and compiling routine reports, creating presentations
20 and reports; handling travel arrangements for the office manager;
21 acting as liaison for manager and staff; monitoring invoices and
22 budget activity; preparing budget variance reports and expense
23 reports; and handling filing. Id.

24     Hansen states in her declaration that she has never seen a
25 copy of the job description attached to Maxwell's declaration, and
26 that she was not described as a "Sales Administrative Assistant."

27

28 OPINION AND ORDER Page 3

1  Hansen Declaration ¶ 2. Hansen does not deny that she was the only
2  "assistant" in the Portland office.

3      Townsend states in his declaration that Hansen had expressed
4  an interest in marketing, and that over the course of her
5  employment she was given tasks with a marketing or sales component,
6  including responsibility for maintaining client relations with
7  three of Advo's larger regional accounts, working with them to
8  develop marketing plans. Townsend Declaration ¶ 2. Townsend states
9  that Hansen was also assigned a variety of marketing projects such
10 as developing individual clients' marketing based on an analysis of
11 customer base, demographic goals, and sales objectives. Id.

12     Hansen acknowledged at her deposition that she compiled
13 "targeting reports," Hallas Declaration, Exhibit A, Oborne
14 Declaration, Exhibit A (Hansen dep.) 71:17-73:19, helped with
15 market analysis projects, id. at 83:19-84:21; aided in "strategic
16 print buys," id. at 84:22-85:19, led team-building classes, sales
17 building exercises, and training on online market research
18 procedures, id. at 85:25-87:17; maintained client relations on
19 three large accounts, id. at 88:20-90:3, and produced "forecast
20 summaries" for the sales team, id. at 90:4-21. See also Reply
21 Declaration of Scott Oborne, Deposition Exhibit 8, (Hansen's
22 resume, listing experience obtained at Advo with these tasks);
23 Hansen dep. 69:1-25 (testimony about resume).

24     Approximately two weeks after Hansen began working for Advo,
25 Advo eliminated its voicemail system after Townsend received
26 complaints about it from Advo management, and Hansen was given the

27

28 OPINION AND ORDER Page 4

1  job of answering the phones. Hansen has testified that she believes
2  she was given the task because she was female. Hansen dep. 99:16-
3  100:6. This belief is based on Hansen's testimony that every time
4  she called any of Advo's offices, a woman answered the phone.
5  Hansen Declaration ¶ 3. Hansen testified that she answered the
6  phone approximately 40 times a day. Hansen dep. 92:11-14.

7     Hansen testified that she was also required to clean the
8  office, dust, do "everybody's dishes," pick up coffee, run errands,
9  pick people up at the airport, get groceries for the office, and
10 buy supplies for meetings and birthday parties. Id. at 93:8-21.
11 According to Hansen, Townsend would "pick up the dishes and put
12 them in my office on my desk," and would scoop up anything lying on
13 the conference room table and toss it on her floor or her desk. Id.
14 at 94:15-18; 94:22-25. Hansen stated that Townsend would tell her
15 to ensure that the conference room was clean for sales meetings.
16 Id. at 95:18-24. She stated further that she had to "make
17 everyone's travel arrangements," id. at 96:3-5, but then admitted
18 that "most of the time" the sales team "did do their own" travel
19 arrangements. Id. at 96:18-97:1.

20    Defendants challenge the inference that Hansen was solely
21 responsible for office housekeeping and other mundane tasks.
22 Townsend states in his declaration that everyone in the office
23 "helped contribute to the upkeep of the office," and that he
24 himself "often washed coffee cups" and "often picked people up from
25 the airport for business meetings." Townsend Declaration ¶ 9.
26 Townsend states that although he sometimes asked Hansen to help
27

28 OPINION AND ORDER Page 5

1  with travel arrangements, he also made travel arrangements for

2  himself "multiple times," and handled his own expense

3  reimbursements. Id. Townsend says he occasionally asked Hansen to

4  purchase supplies for the office, but that he also bought groceries

5  or coffee for the office. Id.

6      Ken Niebur states in his declaration that he frequently washed

7  coffee cups and helped keep the office's kitchen area clean;

8  frequently made his own travel arrangements; and frequently made

9  shopping trips to purchase coffee and other supplies for the

10  office. Niebur Declaration, ¶ 4. Niebur states that Hansen was "not

11  singled out to perform office chores." Id.

12      Richard Cronkrite says that because the Advo office was small,

13  all employees were "expected to assist with office tasks from time

14  to time," and that he frequently pitched in by cleaning up the

15  kitchen and common areas, as well as occasionally purchasing

16  supplies and groceries. Cronkrite Declaration ¶ 6. According to

17  Cronkrite, Hansen was not "singled out to perform these types of

18  tasks, although she was the only assistant in the office at that

19  time." Id.

20      Townsend states in his declaration that Hansen regularly

21  called in sick, left work early, or arrived late. Townsend

22  Declaration ¶ 4. Townsend has compiled a list, based on Advo's

23  attendance records, showing that between September 29, 2004 and

24  February 16, 2006, Hansen was absent 18 days; between 60 and 105

25  minutes late on eight occasions; and either left early or arrived

26  late on five other occasions. Id. Townsend states that he counseled

27

28  OPINION AND ORDER Page 6

Hansen about her attendance in March 2004, May 2004, September 2004, and September 2005. Id. at ¶ 5, 6. According to Townsend, Hansen's lack of attendance was an "obstacle to her receiving more substantive marketing tasks," and "placed a strain on the sales team." Id. at ¶ 8. Hansen contends that no one except Townsend told her attendance was a problem, and that she arranged to have time off for medical reasons. Hansen dep. 155:4-158:5; Hansen Declaration ¶ 9. However, Advo counters that Hansen testified she requested leave for medical reasons in July 2005, Hansen dep. 155:20-24, and that Townsend's log omits incidents occurring in July or August 2005. See Townsend Declaration ¶ 4.

Niebur states in a declaration that he was "frustrated" by Hansen's attendance, because she was "often late to work and frequently called in sick." Niebur Declaration ¶ 3. Niebur says he noticed an attendance pattern in which Hansen was absent from work on days Townsend was out of the office, and that he expressed his frustration with Hansen's attendance to Townsend. Id.

Cronkrite states in a declaration that Hansen performed her job well when she was at work, but was frequently absent, and that he expressed his frustration with Hansen's attendance to Townsend. Cronkrite Declaration ¶ 5.

Hansen gave notice that she was leaving on February 14 or 16, 2006; her resignation letter is dated February 14, 2006, but there is evidence that she tendered the letter to Townsend at a meeting on February 16, 2006. According to Townsend, he was scheduled to meet with Hansen to review attendance issues on February 16, 2006,

OPINION AND ORDER Page 7

1 and Hansen "started out the meeting by submitting a letter of
2 resignation." Townsend Declaration ¶ 10. In her resignation letter,
3 Hansen said she had "decided to take a different path with her
4 career." Hansen dep. Exhibit 12. At the meeting with Townsend,
5 Hansen asked that her last day of employment be March 7, 2006.
6 Hansen dep. 174:22-24. Townsend states that at the meeting on
7 February 16, 2006, Hansen complained about her work
8 responsibilities; he responded that her attendance was an issue
9 underlying her not being assigned marketing tasks; and Hansen told
10 Townsend about offensive statements Fune had made to her. Id. See
11 also Hansen dep. 182:10-21. According to Townsend, this
12 conversation "was the first time I had heard of the allegations
13 regarding Roger Fune," and Townsend reported Hansen's concerns to
14 Advo's HR department, as well as advising Hansen to follow up with
15 HR on her own. Id. [1]

16

17    [1] Hansen asserts that in September or October 2005, she
   complained about Townsend and Fune to Maxwell's predecessor,
18 Quock. According to her testimony, very early in her employment
   she e-mailed Quock saying she was having problems at work with
19 Townsend, and "just an overall bad working environment" and asked
   if Quock would call her on her cell phone at a certain time, so
20 that Fune would not overhear the conversation. Quock called her
   and they talked for about half an hour. During the call, Hansen
21 told Quock about "Tim and the yelling and swearing that he would
   do," e-mails Townsend would send out when people were late, and
22 about Fune "pretty much on a daily basis [making] inappropriate
   comments." Hansen dep. 57:12-60:19. According to Hansen, Quock
23 promised an investigation, but never called anyone on Hansen's
   team. Id. 60:20-61:24. The evidence indicates that Quock left
24 Advo sometime before Maxwell was hired, on December 2, 2005.
   There is no evidence in the record that Townsend knew of Hansen's
25 complaints to Quock about himself and Fune. Nor is there any
   evidence that Quock conducted an investigation of Hansen's
26 complaints at any time between September or October 2005 and his
   departure from Advo at some date before December 2, 2005.
27

28 OPINION AND ORDER Page 8

Townsend contacted the HR representative, Emanuel Maxwell. Maxwell Declaration ¶ 10; Townsend Declaration ¶ 10. Maxwell contacted Hansen by telephone the evening of her resignation, see Hansen dep. 183:22-24; 189:18-25, to begin an investigation into her complaint. Maxwell Declaration ¶ 10.

Hansen's allegations of misconduct against Fune are:

1.  Fune called Hansen into his office and showed her a website depicting a T-shirt with an outline of a woman on a gynecologist's examining table, with the doctor's head between her knees, and saying, "Best view in town." Hansen dep. 130:10-20.

2.  On the second day of Fune's employment at Advo, Townsend was talking to Hansen and Fune about communication techniques used on customers by a good salesperson, and Fune said, "You have to do like Jedi mind tricks with them, like women," or something similar. Hansen dep. 128:16-23.

3.  When a loose hair had fallen on Hansen's shirt, Fune reached out as though to grab it, within a few inches of her breast. Fune told Hansen he was not trying to fondle her; he was trying to remove a hair. Hansen herself removed the hair from her shirt. Hansen dep. 141:3-13.

4.  Fune returned from a sales call and told Hansen he should have taken her on the call because of her appearance. Maxwell Declaration, Exhibit D; Hansen dep. 152:21-153:7.

5.  During the summer of 2005, Fune made a suggestive comment

OPINION AND ORDER Page 9

about the uniforms his daughter's volleyball team wore. Hansen dep. 148:2-6; Maxwell Declaration, Exhibit D.

6. Hansen felt she was working in a "boys club environment" because Fune had taken male employees into his office to show them things on the Internet, and because Townsend scheduled a golf event on a day Hansen had asked to take off from work. Maxwell Declaration, Exhibit D; Hansen dep. 188:1-12.

7. On an Advo business trip to Seattle in 2005, Fune joked that he would go to a strip club after dinner; during dinner he positioned himself at the restaurant table so he could see a music video on TV, referring to "hot girls" and "soft core porn." Maxwell Declaration, Exhibit D; Hansen dep. 77:16-24.

8. Fune would "talk about women and their body parts," although Hansen could provide no details of these comments. Hansen dep. 61:12-18; 136:2-16; 151:3-22.

9. In July 2005, Fune commented to Hansen that his daughter's 13 and 14 year old friends had large breasts and he thought it was a tease to someone his age because he couldn't tell how old they were. Hansen dep. 138:3-9.

10. In the fall of 2005, Hansen heard "female sex sounds" coming from Fune's computer speakers. Hansen dep. 146:14-18.

11. Around December 2005, Fune told Hansen a woman in the building was trying to get his attention because she

OPINION AND ORDER Page 10

would regularly walk past his office window and stick her
chest out. Hansen dep. 138:22-139:4.

12.    In December 2005, on a team building trip to Park City,
       Utah, Fune pointed out a bumper sticker that said, "I
       love head." Hansen dep. 169:1-5.[2]

The day after tendering her resignation letter, on February
17, 2006, Hansen sent an e-mail to the other employees of the
Portland office saying she had "decided to go back to school and
work towards my Masters in Business," Hansen dep. Exhibit 13,[3] and
saying,

> [I]t is important to me that I pass on my appreciation
> for just how much I learned and how valuable this
> experience was .... [G]etting to know each of you has
> been wonderful. It is nice knowing that there are
> companies out there, like Advo, that are made up of such
> wonderful, hard working and loyal people. I truly will
> miss working with all of you.

Id. Hansen states in her declaration that she was "instructed to

---

[2] According to Fune's deposition testimony, the bumper
sticker said, "I love Head Skis." Fune dep. 48:2-6. Fune
testified that he told the driver of the van, "I can't believe
that guy has it on his car." Id. 48:7-9. Fune did not remember
Hansen saying anything about that. 48:10-12.

[3] Hansen does not deny that before submitting her
resignation, she had purchased books to prepare for graduate
course work, signed up for two classes at PSU, including one
class that met during the day, and sought out part-time
employment that would work with a school schedule. Defendant's
CSF 12. Nor does Hansen deny that approximately three weeks after
resigning her employment with Advo, Hansen began taking graduate
classes and obtained part-time employment that accommodated her
school schedule. Defendant's CSF 18. Hansen testified at her
deposition that she applied to PSU before she resigned from Advo,
and that school was set to begin the last week of March. Hansen
dep. 173:10-24. She had signed up for two classes, which met from
3:00-5:00 p.m. and from 5:45-9:00 p.m. Id. at 173:25-174:21.

OPINION AND ORDER Page 11

write this email," Hansen declaration ¶ 11, but also that she "chose to be gracious and professional rather than focus on the negative aspects of my departure." Id. In her deposition, Hansen testified that Townsend had told her to send an email about her leaving to everyone Hansen had regular contact with in Advo, and to "make Advo look good." Hansen dep. 199:10-20.

Maxwell and another HR representative, Jesus Alvaredo, flew to Portland on February 24, 2006, to interview the office staff. Maxwell Declaration, Exhibit D (Maxwell's investigation report). Maxwell and Alvarado met with each Portland office employee. Maxwell Declaration ¶ 13.

Maxwell states that Fune denied behaving in an inappropriate manner toward Hansen. Maxwell Declaration ¶ 14. Maxwell interviewed all the other employees of the Portland office, and concluded that he was unable to substantiate Hansen's complaints. Maxwell Declaration ¶¶ 15, 17, Exhibit D.[4]

Fune testified at his deposition that the only internet sites he visited while at Advo were MSNBC, ESPN and a weather site, NOAA.gov. Crabtree Declaration Exhibit A (Fune dep.) 35:16-36:8. He

---

[4] Hansen claims in her testimony that Townsend heard Fune's "Jedi" comment, see Hansen dep. 127:12-19, and did nothing. Hansen dep. 127:4-9. Hansen testified further that Fune would talk about movies he had seen over the weekend, including the attractiveness of the different women in the movies and descriptions of sex scenes, but she was unable to give any specific examples. Hansen dep. 151:3-22. Hansen says Townsend was "always present" when these comments were being made. Id. at 151:25-152:1. In her papers, Hansen does not cite any other evidence that Townsend knew of Fune's allegedly offensive behavior toward her and did nothing.

denied ever showing Hansen or anyone else in the office anything on his computer. Id. at 36:9-14. Maxwell states in his declaration that as part of his investigation, he reviewed Fune's computer and Internet history, and was unable to confirm Hansen's allegations. He found no inappropriate Internet usage on Fune's computer. Maxwell Declaration ¶ 16. However, there is some evidence that Fune got a new laptop at some point during his employment.

Fune states in a declaration that he and Hansen had a cordial business relationship, sharing daily cigarette breaks. Fune Declaration ¶ 3. Fune states that once Hansen confided in him that she thought a friend's husband was making sexual advances toward her. Id. According to Fune, during out-of-town trips, he and Hansen went out to bars together and, on one occasion, she borrowed Fune's boxer shorts so that she could get in a hot tub with Fune and the rest of the Portland team. Id. at ¶ 4. Fune states that he never saw Hansen outside of work or asked to do so. Id.

According to Fune's declaration, Hansen once asked Fune if he had made a comment about her body, and Fune did not recall ever making such a comment and told her so. Id. at ¶ 5.

Fune states that he never had any indication from Hansen that she believed he had engaged in offensive conduct, and that the first time he learned of Hansen's claims of sexual harassment was during the HR interview. Id. at ¶¶ 7, 9. According to Fune's deposition testimony, Hansen said to him a couple of times that he had "crossed a line," but "every time she said it she was laughing and she always said it like she was giving the punch line to a

OPINION AND ORDER Page 13

1 | joke." Fune dep. 46:24-47:1.

2 |     Fune states that the day of the HR investigation, Hansen
3 | professed ignorance about what Advo might be investigating, and
4 | that shortly before Hansen was interviewed, Fune went to get a
5 | bagel and offered to bring Hansen one, which she accepted. Fune
6 | states that on the day of the investigation, he and Hansen shared
7 | cigarette breaks. Id. ¶ 6.

8 |     Fune asserts that the comment about his daughter's volleyball
9 | uniform was a complaint about how short the shorts were. Fune
10 | Declaration ¶ 8. At his deposition, Fune testified that his
11 | daughter's volleyball team was in "these spandex shorts and I
12 | didn't like them." Hallas Declaration, Exhibit C (Fune dep.) 43:4-
13 | 17. Fune disputes Hansen's suggestion that Fune said he should take
14 | her on sales calls because of her appearance; he claims that at the
15 | start of his employment with Advo, he told Townsend it would "have
16 | been nice to have Darcie on my sales call because she was a good
17 | resource for information." Fune Declaration ¶ 8.  Fune denies
18 | anything sexual in the comment.

19 |     Niebur states in a declaration that at the time of the HR
20 | investigation, he was surprised about Hansen's allegations because
21 | "Darcie never appeared uncomfortable working around Roger." Niebur
22 | Declaration ¶ 5. Cronkite states in a declaration that he never
23 | heard Fune say anything "sexually inappropriate" to Hansen and
24 | never saw him act in a "sexually inappropriate" way toward her.
25 | Cronkrite Declaration ¶ 3. Cronkrite says he never saw Fune access
26 | sexually inappropriate material on his office computer.  Id.

27 |

28 | OPINION AND ORDER Page 14

1 Cronkrite states that Hansen never suggested that she felt
2 uncomfortable working around Fune. Id. at ¶ 4.

3       Hansen continued to work at the Advo office through February
4 24, 2006. Hansen dep. 192:14-193:6; Maxwell Declaration ¶ 17.
5 Maxwell states in his declaration that Hansen told him she felt
6 uncomfortable in the office, and that he inquired of Hansen what
7 Advo could do to make her comfortable. Maxwell Declaration ¶ 17.
8 Hansen indicated to Maxwell that she no longer wanted to work at
9 Advo. Maxwell Declaration ¶ 17.

10      Hansen asserts that she did not want to work from home, but
11 was forced to do so for the last two weeks of her employment as
12 retaliation for her complaints. This assertion is not fully
13 supported by Hansen's actual deposition testimony:

14      Q:   So you finished the meeting with Emanuel [Maxwell]
15           and the other HR guy?

16      A:   Right.

17      Q:   Did you go back to your office?

18      A:   I was just walking out the door, and Tim [Townsend] was
19           right there, and he said, "Are you uncomfortable?" and I
             said, "Yeah. Who wouldn't be?" and then I walked back to
             my office, and Tim went in to talk with them.

20      Q:   Okay.

21      A:   Tim was in there for 20 minutes or so, probably, and when
22           he came out ... they called me back in and sat me down,
             and they said, "We're going to have you work from home
23           for the last few weeks. It will be great. A lot of people
             like working from home. They get to wear their pajamas,"
24           blah, blah, blah. It was, like, "I'm going to take you
             back to your office so you can pack up your things."

25           I was physically in shock at that point. I had no words.
26           Emanuel walked me back to my office, and I was cleaning
             out my drawer, and he came in, and he shut the door
27           behind him, and he said, "How are you feeling about the

28 OPINION AND ORDER Page 15

way things have gone?" and I said, "Actually, I am really mad," and I did start to cry. My lip was quivering. I was really uncomfortable. And he said, "You're mad?" and questioned that, and I replied and said, "Yeah. It took a lot to give you guys examples of everything that happened and try to do the right thing, and I feel like I'm being made to look like the bad guy. I'm being sent home. I don't want to work from home," and he said, "Well, do you still want to work here?" and I said, "No, not now," and he said, "Well, we probably would be handling things different [sic] if you still wanted your job."

Hansen dep. 194:14-195:24.

Hansen testified that she left the office and did not return. While at home, she "sat by my computer and waited and sent e-mails" to Townsend but did not hear from him. Hansen dep. 196:6-197:7. This testimony is contradicted by a string of e-mails between Hansen and Maxwell.

Hansen sent Maxwell an e-mail dated Wednesday, March 1, 2006, saying Townsend had sent out two notices that he was sick and a third saying he was out traveling for the rest of the week. Hansen wrote, "This leaves me no time to get into contact with him. While he has excuses, they all seem very convenient." Maxwell Declaration, Exhibit E. Hansen continued that she had left a voicemail asking Townsend to call her on Monday (presumably, the preceding Monday, February 27, 2006). Id.

Maxwell responded to Hansen's e-mail the same day, March 1, 2006, saying he would ask Townsend to call Hansen immediately. Id. Maxwell did so; Townsend responded via e-mail, also dated March 1, 2006, saying he had been sick for the previous four days, and had notified Hansen and other employees of his illness via e-mail. Id. Townsend also said that on the morning of March 1, 2006, he had

OPINION AND ORDER Page 16

traveled to Seattle and worked on projects there. <u>Id.</u> Townsend wrote, "As for projects ... I do not have anything for her at this time but will check when I get back to the Portland office on Friday." <u>Id.</u> Townsend then sent Hansen a list of things to do, including an Advo "go to" list, a list of outstanding projects she was working on, and a process description of how sales forecasting worked, to be used as a teaching tool for her replacement and a reference tool for other associates. <u>Id.</u> On March 2, 2006, Townsend sent another e-mail asking Hansen to e-mail a vacation file to him. <u>Id.</u> Hansen sent Maxwell an e-mail on March 2, 2006, acknowledging that she had received an e-mail from Townsend listing tasks he wanted completed, and saying she was working on them. <u>Id.</u> Hansen's pay was not decreased during the time she was working at home.

### Standard

A party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues exist for trial. <u>Warren v. City of Carlsbad</u>, 58 F.3d 439, 441 (9th Cir. 1995). A genuine dispute arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>State of California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

OPINION AND ORDER Page 17

1 574, 587 (1986).

2    On a motion for summary judgment, the court must view the
3 evidence in the light most favorable to the non-movant and must
4 draw all reasonable inferences in the non-movant's favor. Clicks
5 Billiards Inc. v. Sixshooters Inc., 251 F.3d 1252, 1257 (9th Cir.
6 2001). The court may not make credibility determinations or weigh
7 the evidence. Reeves v. Sanderson Plumbing Products, Inc., 530 U.S.
8 133, 150 (2000). Where different ultimate inferences may be drawn,
9 summary judgment is inappropriate. Sankovich v. Ins. Co. of N. Am.,
10 638 F.2d 136, 140 (9th Cir. 1981).

11                              **Discussion**
12 A.   Sex Discrimination Claim
13        1.   Was Hansen subjected to actionable harassment?
14    A  claim  for  sex  discrimination  based  on  hostile  work
15 environment, under Title VII or Or. Rev. Stat. § 659A.030, requires
16 a  plaintiff  to  show  that  the  workplace  was  "permeated  with
17 discriminatory  intimidation,  ridicule  and  insult,"  that  was
18 sufficiently severe or pervasive to alter the conditions of her
19 employment and create an abusive working environment. Harris v.
20 Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Mains v. II Morrow,
21 Inc., 128 Or. App. 625, 634 (1994). The standard is both subjective
22 and objective: the victim must perceive the environment as abusive,
23 and the environment must be one that a reasonable person would find
24 hostile or abusive. Faragher v. City of Boca Raton, 524 U.S. 775,
25 787 (1998); Nichols v. Azteca Restaurant Enterprises, Inc., 256
26 F.3d 864, 871 (9th Cir. 2001). In addition, plaintiff must prove

27

28 OPINION AND ORDER Page 18

that any harassment took place "because of sex." <u>Oncale v.
Sundowner Offshore Servs., Inc.,</u> 523 U.S. 75, 79 (1998); <u>Nichols,</u>
256 F.3d at 872. See also <u>Garcez v. Freightliner Corp.,</u> 188 Or.
App. 397, 408 (2003).

Factual circumstances relevant to this showing include "the
frequency of the discriminatory conduct; its severity; whether it
is physically threatening or humiliating, or a mere offensive
utterance; and whether it unreasonably interferes with an
employee's work performance." <u>Harris,</u> 510 U.S. at 23; <u>Garcez,</u> 188
Or. App. at 408.

Advo contends that even if each of Hansen's allegations of
misconduct against Fune is accepted, in the aggregate they do not
rise to the level of severity or pervasiveness necessary to make
out a claim for hostile environment sexual harassment. See <u>Harris,</u>
510 U.S. at 21 ("Conduct that is not severe or pervasive enough to
create an objectively hostile or abusive work environment--an
environment that a reasonable person would find hostile or
abusive--is beyond Title VII's purview.") Advo argues that the
"severe or pervasive" standard is designed to exclude "the ordinary
tribulations of the workplace, such as the sporadic use of abusive
language, gender-related jokes, and occasional teasing." <u>Faragher,</u>
524 U.S. at 786.

Workplace harassment, even harassment between men and women,
is not automatically discrimination because of sex "merely because
the words used have sexual content or connotations." <u>Oncale,</u> 523
U.S. at 79. Rather, the plaintiff must always prove that the

OPINION AND ORDER Page 19

conduct at issue was "not merely tinged with offensive sexual connotations, but actually constituted discrimination because of sex." Id. See also Candelore v. Clark County Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992)(isolated incidents of sexual horseplay or inappropriate behavior not so egregious as to render work environment hostile); Jordan v. Clark, 847 F.2d 1368, 1374-75 (9th Cir. 1988)(off-color jokes told at work did not constitute abusive environment); Benitez v. PGE, 799 F. Supp. 1075, 1080-81 (D. Or. 1992)(sporadic comments or incidents of harassment, without more, will not support a hostile environment claim); Kortan v. California Youth Authority, 217 F.3d 1104 (9th Cir. 2000)(although supervisor's sexually related comments about women were offensive, his conduct was not frequent, severe or abusive enough to interfere unreasonably with plaintiff's employment; offensive conduct was concentrated on one occasion, occurred in the wake of a dispute, and comments were about other people); Shepherd v. City of Salem, 320 F. Supp.2d 1049, 1057-58 (D. Or. 2004)(supervisor hugged and "rubbed up" against female employees, offered to adjust employee's blouse, commented that he liked employees' short skirts, and commented to employees about female customers' hips and breasts).

Hansen asserts that during her employment at Advo, she was subjected to an "unwelcome constant barrage of offensive comments of a sexual nature." She relies on her own characterization of Fune's behavior as "constant," and "daily," and her own testimony that she continually told Fune he was "crossing the line." But the mere conclusory assertion that conduct was constant is not

OPINION AND ORDER Page 20

sufficient to prove pervasiveness, in view of the paucity of Hansen's specific examples of such conduct. As Advo points out, on a motion for summary judgment, Hansen is required to come forward with specific facts which show there is a genuine issue for trial, and Hansen is required to provide sufficient detail to "enable a reasonable trier of fact to conclude that discrimination has occurred." McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 n. 5 (9th Cir. 2004).

Further, as Advo points out, the conduct was not "severe," as that term is used in sexual harassment cases: Hansen does not allege that Fume propositioned her, touched her inappropriately, expressed any romantic or sexual feelings toward her, threatened or insulted her, called her names, stalked her, or used offensive language toward her. The conduct alleged against Fune is neither severe nor pervasive enough to constitute sexual harassment. The hostile environment sexual harassment claim is dismissed.

   2.  Was Hansen subject to sex discrimination in her job duties?

The legal framework for considering summary judgment in a disparate treatment discrimination case is that established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Chuang v. Univ. of Calif. at Davis, 225 F.3d 1115, 1123 (9th Cir. 2000). The federal burden-shifting analysis also applies to discrimination claims under Oregon statutes. Snead v. Metropolitan Property & Cas. Co., 237 F.3d 1080, 1093 (9th Cir. 2001).

Under McDonnell Douglas, Hansen must first establish a prima facie case of discrimination. Vasquez v. County of Los Angeles, 349

OPINION AND ORDER Page 21

F.3d 634, 640 (9th Cir. 2003).   If she succeeds in doing so, the burden shifts to Advo to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. Id. If it does so, Hansen must show that the articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

        a.   Prima facie case

    A prima facie case of discrimination under McDonnell Douglas requires Hansen to show that 1) she belongs to a protected class; 2) she was performing according to her employer's legitimate expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees outside her protected class were treated more favorably, or other circumstances surrounding the adverse employment action give rise to an inference of discrimination. Godwin v. Hunt Wesson, Inc., 150 F.3d 1217, 1220 (9th Cir. 1998). Advo moves against this claim on the grounds that Hansen cannot show that she suffered an adverse employment action, or that similarly situated male employees were treated more favorably.

        b.   Adverse employment action

    In this jurisdiction, a wide array of disadvantageous changes in the workplace can constitute adverse employment actions. Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000). Nevertheless, Hansen has pointed to no evidence that Advo inflicted any such

OPINION AND ORDER Page 22

1  disadvantageous changes on her. There is no evidence that Hansen
2  was terminated, demoted or not promoted, disciplined, suffered a
3  reduction in pay, received an unfavorable employee review, was
4  transferred, or had job duties taken away.

5     Hansen asserts that she has met her prima facie case by
6  showing that she was "reassigned" to administrative duties based on
7  her gender, arguing that she was hired as a "sales and marketing
8  assistant" rather than an "administrative assistant" and told she
9  would be doing sales and marketing, not menial administrative tasks
10 such as answering phones and washing coffee cups.

11    While there is authority that transfers of job duties can
12 constitute adverse employment actions, see, e.g., Yartzoff v.
13 Thomas, 809 F.2d 1371, 1376 (9th Cir. 1987)(transfer of job duties
14 away from plaintiff), Hansen cites to no legal authority suggesting
15 that misrepresentations at a job interview about the importance of
16 her position or the number of interesting tasks she would be
17 assigned is actionable as sex discrimination. The evidence
18 establishes that Hansen, who was in her early twenties at the time
19 of her employment, was hired as an "assistant," to work in the
20 office with Townsend, while all the other Portland office employees
21 worked as salesmen.

22    But even if Hansen could show that assigning her to such
23 duties as answering the phone, washing most of the dishes, and
24 making travel arrangements for other people, instead of allowing
25 her to pursue sales and marketing tasks exclusively, was an adverse
26 employment action, Hansen's prima facie case founders on the

27

28 OPINION AND ORDER Page 23

1  absence of a male comparator.

2           c.   Similarly situated male employee

3      To be considered "similarly situated, the other employee's job

4  must be similar to the plaintiff's in all material respects." <u>Moran</u>

5  <u>v. Selig</u>, 447 F.3d 748, 755 (9th Cir. 2006). There is no evidence

6  in the record of the existence of a male employee whose job was

7  similar to Hansen's in all material respects, and who was treated

8  differently. The absence of a male comparator is fatal to Hansen's

9  prima facie case of discrimination.

10     Because Hansen has not made out a prima facie case, I do not

11 reach Advo's articulation of a legitimate nondiscriminatory reason

12 for its actions, although on this record, Advo also would be

13 entitled to summary judgment on the ground that Hansen has not

14 carried her burden of showing that Advo's proffered explanations

15 for Hansen's job duties--that the automated phone system was

16 discontinued because of complaints, that Hansen was the only

17 assistant in the office, and that the menial tasks of which she

18 complains were shared by all the others in the office, including

19 the manager-- were pretextual. Hansen's sex discrimination claim is

20 dismissed.

21         3.  Was Hansen constructively discharged because of a hostile
               work environment?
22

23     Although a determination of constructive discharge is normally

   a factual question, see <u>Poland v. Chertoff</u>, 494 F.3d 1174, 1184 (9th
24
   Cir. 2007), constructive discharge based on Title VII is based on
25
   an objective inquiry: Did working conditions become so intolerable
26
   that a reasonable person in the employee's position would have felt
27

28 OPINION AND ORDER Page 24

compelled to resign? <u>Pennsylvania State Police v. Suders</u>, 542 U.S. 129, 147 (2004). This standard requires of plaintiff a burden of proof more onerous than the "severe or pervasive" standard of sexual harassment. <u>Id.</u> Unless conditions are "beyond ordinary discrimination, a complaining employee is expected to remain on the job while seeking redress." <u>Id.</u> (internal quotation and citation omitted). In <u>Poland</u>, the court held that constructive discharge occurs when

> the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

<u>Poland</u>, 494 F.3d at 1184. As the <u>Poland</u> court observed, the law

> set[s] the bar high for a claim of constructive discharge because federal antidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.

<u>Id.</u>

In <u>Poland</u>, the court held that plaintiff had not, as a matter of law, shown that he was constructively discharged because neither the court's factual findings nor any other evidence in the record indicated that plaintiff's working conditions were "so poor that they trumped his motivation to earn a living." 494 F.3d at 1185. Hansen has not made out a constructive discharge claim based upon her assignment to office assistant job duties. See, e.g., <u>Poland,</u> 494 F.3d at 1185 ("constructive discharge cannot be based upon the employee's subjective preference for one position over another.")

OPINION AND ORDER Page 25

Nor, having failed to demonstrate that Fune's alleged misconduct was either severe nor pervasive enough to constitute sexual harassment, can Hansen satisfy the heavier burden of proving that her working conditions were so intolerable that a reasonable person would have felt compelled to resign, particularly when, as here, the record contains evidence that Hansen's motivation in quitting her job was the desire to resume her education.

Hansen's sex discrimination claim based on constructive discharge is dismissed.

B. Retaliation Claim

To establish a claim of retaliation, Hansen must show that 1) she engaged in protected activity; 2) she suffered an adverse employment action; and 3) there was a causal link between the protected activity and the adverse employment action. Poland, 494 F.3d at 1180; Villarimo v. Aloha Is. Air, Inc., 281 F.3d 1054, 1064 (9th Cir. 2002). At the prima facie stage, the causal link element is construed broadly, so that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated. Poland, 494 F.3d 1181, n. 2. Advo does not dispute that Hansen's complaints about Fune, whether made to Quock or to Townsend, constitute protected activity.

An adverse employment action is "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." Poland, 494 F.3d at 1180; Ray, 217 F.3d 1234, 1242-43. Advo asserts that Hansen has not demonstrated that she suffered an adverse

OPINION AND ORDER Page 26

employment action. I agree.

Hansen's assignment to the duties of an administrative assistant cannot constitute an adverse employment action because the assignment was not a "disadvantageous change" in her employment, and, even if it were, Hansen has not produced any evidence that assigning her to those duties was in retaliation for protected activity. Hansen contends that she was assigned to the duties of an administrative assistant from the beginning of her employment, before she complained to Quock, Townsend, or Maxwell.

Although Hansen asserts that being told to work at home after Maxwell arrived to investigate her complaints about Fune was an adverse employment action, this assertion is unpersuasive. Hansen had already tendered her resignation before she was told to work at home; further, there is evidence in the record that Hansen expressed discomfort with continuing to work in the office after she made her complaints. In view of this evidence, Hansen has not demonstrated that working at home for the last two weeks of her employment, with the same salary and benefits, was an adverse employment action. Hansen argues that being made to work at home would deter other employees from complaining about sexual harassment, but in view of the evidence that she had already resigned and had expressed discomfort with remaining in the office, no reasonable jury could conclude that being told to work at home constituted an adverse employment action taken in retaliation for Hansen's complaints in February 2006. Assuming the truth of Hansen's contention that she had made earlier complaints about Fune

OPINION AND ORDER Page 27

to Quock, there is no evidence of any adverse employment action taken against her as a result of these complaints; Hansen's only contention is that Quock failed to investigate her complaints, and this is not an adverse employment action against Hansen.

Hansen's retaliation claim is dismissed.

C.    Intentional Infliction of Emotional Distress Claim

A claim for intentional infliction of emotional distress requires the plaintiff to show 1) an intent by defendant to inflict to inflict severe emotional distress on the plaintiff; 2) that defendant's acts caused plaintiff severe emotional distress, and 3) that defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct. McGanty v. Straudenraus, 321 Or. 532, 543 (1995). What constitutes an extraordinary transgression of the bounds of socially tolerable conduct is a question of law. Harris v. Pameco Corp., 170 Or. App. 164, 171 (2000).

Advo asserts that the record before the court provides no basis from which to find that the conduct of Advo, its managers or its employees was outrageous. I agree. Nor does the record before the court demonstrate an intent by Advo to inflict severe emotional distress on Hansen. Hansen's claim for intentional infliction of emotional distress is dismissed.

D.    Punitive Damages Claim

Advo moves against Hansen's claim for punitive damages, asserting that she has not produced evidence showing that Advo engaged in discriminatory conduct with malice or with reckless

OPINION AND ORDER Page 28

indifference to her federally protected rights, citing <u>Kolstad v.</u>
<u>American Dental Society</u>, 527 U.S. 526 (1999). Advo argues that
Hansen must show that it acted with "knowledge that its actions may
have violated federal law," or with disregard by "showing that the
defendant's employees lied ... in order to cover up their
discriminatory actions." <u>Id.</u> at 535.

Advo points to the evidence that it has adopted an anti-
harassment policy, see Defendant's CSF 21, and implemented the
policy in good faith. <u>Id.</u>; see also Maxwell Declaration ¶ 3.

Hansen counters that she has presented evidence that Townsend
"did nothing to stop the harassment she experienced despite
repeated complaints and being present for some of the inappropriate
comments." But there is no evidence that Hansen ever complained to
Townsend about harassment until the February 16, 2006 meeting.
Hansen does not dispute that immediately after Hansen complained to
Townsend about Fune on February 16, 2006, Townsend called Maxwell
at HR, Maxwell contacted Hansen, and Maxwell began investigating
the complaints.

Hansen also relies on her complaint to Quock. This single
episode does not constitute "repeated" complaints, and Quock's
failure to investigate Hansen's complaint about Townsend and Fune
during the two months or so that remained of his employment with
Advo is not conduct sufficient to create a genuine issue of
material fact in support of Hansen's claim for punitive damages.
Regardless of whether Quock's failure to respond to a complaint by
Hansen constituted inadequate implementation of Advo's

OPINION AND ORDER Page 29

1  antidiscrimination policy, it does not constitute the kind of

2  malicious or reckless of behavior that justifies punitive damages.

3      The claim for punitive damages is stricken.

4      E.    <u>Motion to Strike</u>

5      Advo has filed objections to some of Hansen's evidence. I have

6  considered those objections and my rulings on those objections are

7  reflected in this Opinion and Order.

8                              **Conclusion**

9      Defendant's motion for summary judgment (doc. # 17) is

10 GRANTED.

11     IT IS SO ORDERED.

12

13     Dated this 25th day of March, 2008.

14

15                              _____

16                              Dennis James Hubel

17                              United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28 OPINION Page 30